IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DENISE R. BAGWELL          )
                           )
v.                         )     No. 3:05-0656
                           )     Judge Wiseman/Bryant
MICHAEL J. ASTRUE, Commissioner of )
Social Security[1]         )

To: The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

### I.  Introduction

This is a civil action for judicial review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c), of the final decision of the Commissioner of Social Security on plaintiff's application for Supplemental Security Income (SSI) benefits, as provided in Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. Currently pending is plaintiff's motion for judgment on the administrative record (Docket Entry No. 14), to which defendant has responded (Docket Entry No. 15). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

_____

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of Social Security on February 12, 2007, and is "automatically substituted" as party defendant in this case, pursuant to Fed.R.Civ.P. 25(d)(1).

1

## II.  Procedural History

Plaintiff filed her current SSI application[2] on February August 14, 2001 (Tr. 60-62), with a protective filing date of July 30, 2001 (Tr. 57).  The application was denied initially (Tr. 31-32, 39-42) and upon reconsideration (Tr. 33-34, 45-46).  On January 6, 2004, at plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ), who received testimony from plaintiff and a vocational expert (VE).  (Tr. 373-397)  Plaintiff was represented by counsel at the hearing.  The ALJ took the case under advisement until April 1, 2004, when he issued a written decision finding plaintiff "not disabled" within the meaning of the Social Security Act.  (Tr. 13-18)  The ALJ made the following enumerated findings:

1.  The claimant has not engaged in substantial gainful activity since the alleged onset date.

2.  The claimant has "severe" impairments including degenerative disc disease of the lumbar spine, borderline IQ, attention deficit hyperactivity disorder (ADHD), mild bulging disc and mild desiccation, but she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, of Regulations No. 4.

3.  The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

4.  The claimant retains the residual functional capacity to perform medium work that consists of sitting a total of 6 hours, standing and/or walking a total of 6 hours

---

[2]Plaintiff had filed for benefits six times prior to the current application (Tr. 54), most recently on February 13, 2001, with a protective filing date of December 28, 2000 (Tr. 54-56).

in an 8-hour workday.  In addition, she is able to occasionally lift 50 pounds and frequently lift 25 pounds in an 8-hour workday.  The claimant's mental impairments would impose mild to moderate limitations in the basic mental work activities, in maintaining concentration, persistence and pace (Exhibit 17F). Additionally, she would be limited to jobs performable by someone with an IQ in the 70's.

5.  The claimant's impairments would not prevent her from performing her past relevant work as a fast-food worker and fountain server.

6.  The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(f)).

(Tr. 17)

On June 17, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 6-8), thereby rendering that decision the final decision of the Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. §§ 405(g), 1383(c).  If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive.  Id.

## II.  Review of the Record

Unfortunately, neither the parties to this litigation nor the ALJ below have meaningfully endeavored to summarize the 400-page record in this case.  It is clearly not the responsibility of this Court to marshal the evidence compiled during proceedings before the agency.  However, disappointingly,

3

plaintiff's shortcomings here and those of the Commissioner below
have combined to raise issues which neither party adequately
addresses, on a record which has largely been left to speak for
itself.  Rather than continue the trend, the undersigned has
highlighted portions of the record not addressed below in section
III of this report, on the way to respectfully recommending,
*infra*, remand of this matter on grounds not advanced with any
particularity in plaintiff's papers.

The ALJ's summary of the record, in its entirety, is
set out below:

> The claimant is a 31 year old (younger) individual
> with an 11th grade (special) education.  She alleges
> disability since July 30, 2001.  The claimant has past
> relevant work as a restaurant fast-food worker, and
> fountain server.  The record reflects that the claimant
> has not engaged in substantial gainful activity since
> her alleged onset date.
>
> . . . The claimant has severe impairments
> including degenerative disc disease of the lumbar
> spine, borderline IQ, attention deficit hyperactivity
> disorder (ADHD), mild bulging disc and mild
> desiccation.
>
> Prior to the claimant's alleged onset date, she
> was diagnosed with adjustment disorder and mild mental
> retardation.  In June 2000, she was referred to Denise
> Ann Zecca, Ph.D. for a psychological evaluation with IQ
> and mental testing.  On the WAIS-III, the claimant
> earned a Verbal IQ of 64, Performance IQ of 67, and
> Full Scale IQ of 62, placing her in the mild mental
> retardation range of functioning.
>
> The claimant presented to James Hebda, Ph.D. for a
> psychological evaluation on September 12, 2003.  He
> reported that this was the claimant's sixth application
> for disability benefits.  The claimant alleged learning
> problems and back pain.  She denied smoking, drinking

4

or drug use, and no inpatient psychiatric history was indicated. The claimant reported that she had outpatient counseling two times at a local mental health center in 1994 for depression, but stated that she was not on any medication. She reported that she did her cleaning in the morning and then watched television. In the afternoon, she took her son to the store. She stated that she sat on the porch in the evenings and visited with her boyfriend's mother, or took her son to the park. She reported that she did all the cooking, laundry and kitchen chores. She also stated that she did all of the grocery shopping independently. She was able to understand, remember and carry out instructions effectively, and psychological testing did not reveal significant evidence of organicity. Her estimated level of intellectual functioning fell within the borderline classification of intelligence, and her mental status was not altered by depressed or anxious features. The WAIS-III was administered and the claimant obtained a Verbal IQ of 76, Performance IQ of 79 and a Full Scale IQ of 76. She was assigned a Global Assessment of Functioning of 63, which indicates mild symptoms or mild difficulty in social and occupational functioning. Overall impression indicated no significantly limited cognitive or emotional problems. Diagnostic impressions were: expression disorder, reading disorder, mathematics disorder, borderline intellectual functioning, with a history of back pain and possible scoliosis, and current psychosocial stressors including unemployment and financial difficulty. Exhibit 17F [(Tr. 288-98)].

The claimant presented to Dr. Donita Keown for a consultative physical examination on September 18, 2003. The claimant alleged anemia, headaches, sinusitis, bronchitis, tenosynovitis, wrist and hand problems, pelvis problems, hip and leg pain, back and vision problems. All testing was within normal limits, and Dr. Keown reported that the examination showed full range of motion of joints in the upper and lower limbs without evidence of acute or chronic inflammation. There was no evidence that suggested any exertional limitations. Exhibit 18F [(Tr. 299-310)].

The claimant's treating physician, Dr. Paul Cha completed an assessment of the claimant's ability to do work-related activities on September 24, 2003. He

found that the claimant had lumbar disc disease, and iron deficiency anemia.  He assessed that she could frequently lift and/or carry 20 pounds, could stand and/or walk at least 2 hours in an 8-hour workday, and could sit less than 6 hours in an 8-hour workday with limited pushing and pulling.  He further assessed the claimant could occasionally balance, kneel, crouch, crawl and stoop, but never climb.  The claimant could occasionally reach, handle, and finger with limited seeing and speaking.  He assessed that the claimant should also avoid temperature extremes, noise, vibration, humidity, hazards and fumes (Exhibit 19F) [(Tr. 311-44)].  On October 25, 2003, Dr. Cha again completed an assessment of the claimant's ability to do work-related activities.  He found that the claimant had hypertension, lumbar disc disease and heavy medications.  He assessed the claimant could occasionally lift and/or carry 20 pounds, could stand and/or walk about 2 hours in an 8-hour workday, and could sit, with normal breaks, less than 4 hours in an 8-hour workday.  Exhibit 27F [(Tr. 367-70)].

MRI of the lower spine on December 9, 2003, revealed mild problems with spinal stenosis.  Exhibit 28F [(Tr. 371-72)].

At the hearing, the claimant testified that she finished the 11th grade in special education and was promoted to the 12th grade.  She testified that her 8 year-old son lives with her, and her source of income is AFDC and Section 8 rent.  The claimant alleges back pain and reading problems, and reported that she takes hydrocodone for her lower back pain.  She testified that she walks all the time, to the mailbox, the store, and the bus stop.  Regarding her prior work history, she reported that she worked through Vocational Rehabilitation making cardboard boxes, and also worked for Krystal and Ryans.  She worked at Krystal about 3 months, putting chicken and fries in a box, and worked at Star Tech about a week.  She reported that she quit her last job at the fast food restaurant, because of a dispute with the manager.

(Tr. 14-15)

Case 3:05-cv-00656   Document 17   Filed 04/24/07   Page 6 of 21 PageID #: 50

### III. Conclusions of Law

#### A. <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. <u>Hurst v. Sec'y of Health & Human</u>

7

<u>Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her

_____

[3]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

8

age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

9

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff first contends that the ALJ erred in rejecting the assessments of her treating physician, Dr. Cha, citing the recognized deference that is owed to treating sources and the lack of conflicting assessments of plaintiff's RFC. However, notwithstanding this deference owed to Dr. Cha as a treating physician, it is clear that the ALJ is not bound by Dr. Cha's opinions, which receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence; rather, an ALJ may properly discount a treating physician's opinions if good reasons are given for doing so. <u>E.g.</u>, <u>Bogle v. Sullivan</u>, 998 F.2d 342, 347-48 (6th Cir. 1993); <u>see</u> 20 C.F.R. § 416.927(d)(2).  As explained by the ALJ, his decision to discount Dr. Cha's assessments was based on their contradiction by imaging reports of only mild abnormalities in the region of plaintiff's lumbar spine, by the medical opinion of the non-examining state agency physician, Dr. Kaufman, and by plaintiff's ability to walk "all the time" and care for her young son (Tr. 16).  The ALJ elsewhere noted the contrary opinion of the consulting physician, Dr. Keown, who reported normal findings on physical examination and assessed no exertional limitations (Tr. 14-15).  The undersigned concludes that the ALJ's decision to discount Dr. Cha's assessments was sufficiently explained and is supported by substantial evidence.

10

However, with respect to the record of plaintiff's mental impairments, this case is much more remarkable for what was left unsaid than for what was said, either by plaintiff's counsel or the ALJ. Much of the medical record pertains to plaintiff's intellectual and emotional impairments, though much of that evidence pertains to periods prior to plaintiff's alleged onset of disability. Inexplicably, plaintiff's argument with respect to these impairments, in its entirety, is contained in the following three sentences:

> In the case at bar the opinion of the Administrative Law Judge cannot be based on substantial evidence when he has failed to address the Plaintiff's IQ and GAF scores. These impairments along with the medical impairments previously addressed in the first assignment of error would cause the Plaintiff in combination, to meet the listing requirements for finding of disability. The Administrative Law Judge fails to address these in combination in either his hypothetical question or his findings.

(Docket Entry No. 14 at 4) Plaintiff does not specify the "listing requirements" which are allegedly satisfied, though plainly Listing 12.05C (mild mental retardation) is implicated by the evidence in this case. The requirements of this listing are as follows:

> 12.05 *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

11

* * *

        C.  A valid verbal, performance, or full scale IQ
        of 60 through 70 and a physical or other mental
        impairment imposing an additional and significant work-
        related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

        However, for his part, the ALJ foreclosed development
of the testimonial record on this issue, when he interrupted
counsel's line of questioning related to plaintiff's need for
special education, as follows:

        Q    Okay.  So, so, just about any was special ed?

        A    Special, and all of them were special

             classes.

        Q    Okay.

      ALJ:   I can't quite make the 12.05C, Mr. Hogan.

      ATTY:  Not quite, but we're close.

      ALJ:   All right.

(Tr. 377)  The ALJ does not examine or even reference Listing
12.05 in his narrative opinion, but only states in his enumerated
findings that "she does not have an impairment or combination of
impairments listed in, or medically equal to one listed in
Appendix 1, Subpart P, of Regulations No. 4."  (Tr. 17, finding
no. 2)

        It is unclear whether the ALJ construed counsel's
statement that plaintiff did "not quite" meet Listing 12.05C as

12

obviating any need to explicitly address the listing in his
written decision, or whether he deemed the evidence of
plaintiff's borderline intellectual functioning (demonstrated by
IQ scores recognized by the ALJ as "in the 70's") too compelling
to require any mention of the mental retardation listing or the
evidence which was "close" to meeting its criteria.  The only
exhibit in the record which the ALJ cites in support of his
finding of an IQ in the 70s is the September 2003 report of
consultative examiner James Hebda, Ph.D. (Tr. 14, 288-94).  Dr.
Hebda diagnosed borderline intellectual functioning, as well as
learning, reading, and mathematics disorders, after obtaining IQ
scores of 76 (Verbal), 79 (Performance), and 76 (Full Scale), and
achievement test scores indicating reading at the third grade
level, and spelling and arithmetic at the second grade level
(Id.).  This consultative report appears to be fully credited by
the ALJ, as it is the only psychological evaluation of record
mentioned in his decision, as well as the sole citation following
the only bit of reasoning supplied in support of his finding of
plaintiff's mental RFC, to wit:  "Regarding her alleged mental
limitations, the evidence of record consistently demonstrates
only mild to moderate symptoms, none of which singly or
collectively, is of a level of severity to completely preclude
her from performing any work activity (Exhibit 17F [Tr. 288-
94])."

13

The ALJ's cursory analysis of plaintiff's alleged mental limitations is troubling, particularly in view of his failure to address the bulk of the evidence on the matter. Apparently having predetermined that plaintiff is not mentally retarded but only mildly to moderately mentally limited, the ALJ presented such limitations in a hypothetical to the VE, with the additional functional restriction that any job identified by the VE as accommodating such restrictions "would have to be performable by someone with an IQ in the seventies." (Tr. 394) The VE testified in response that all unskilled jobs would accommodate such mental limitations (<u>Id.</u>). Of course, under Listing 12.05C (which does not contain any functional criteria corresponding with the required low IQ), an individual with a valid IQ of 70 who otherwise satisfies the listed criteria is presumptively disabled, and the functional ability to perform simple, unskilled work tasks is not regarded as incompatible with such a low IQ. See <u>Brown v. Sec'y of Health & Human Servs.</u>, 948 F.2d 268, 270 (6th Cir. 1991). While there is evidence in this case that plaintiff's IQ is above 70 (Tr. 282, 288), there is also evidence that her IQ is below 70 (Tr. 14, 264-65). While it is the province of the ALJ to resolve conflicts in the evidence, here the conflict is not even addressed by the ALJ, who leaves too much for the plaintiff and this Court to presume, in the undersigned's view.

14

The lone reference in the ALJ's decision to evidence contrary to Dr. Hebda's 2003 assessment, and the basis for plaintiff's bare allegation of error in the ALJ's consideration of his mental impairments, is the following paragraph which begins the ALJ's summary of the medical evidence:

> Prior to the claimant's alleged onset date, she was diagnosed with adjustment disorder and mild mental retardation. In June 2000, she was referred to Denise Ann Zecca, Ph.D. for a psychological evaluation with IQ and mental testing. On the WAIS-III, the claimant earned a Verbal IQ of 64, Performance IQ of 67, and Full Scale IQ of 62, placing her in the mild mental retardation range of functioning.

(Tr. 14) No citation to the record follows this paragraph. While the undersigned has been able to verify a diagnosis of adjustment disorder with depressed mood, given on May 18, 2001 by a psychological examiner (Tr. 197-209), *it does not appear that Dr. Zecca's evaluation is contained in the record*. There is only Dr. Hebda's reference to this evaluation as being a "disability evaluation" (Tr. 164), presumably consultative in nature, likely conducted in relation to plaintiff's April 4, 2000, SSI application (see Tr. 54). The IQ scores obtained by Dr. Zecca are again referenced by the state agency psychological consultant on October 22, 2001 (Tr. 230). The government in its brief argues that these scores are not valid for purposes of the ALJ's decision, because they were obtained prior to plaintiff's alleged onset date, and because they are inconsistent with the scores obtained by Dr. Hebda in 2003 (Docket Entry No. 15 at 8). As

15

explained below, the undersigned is not persuaded by this argument.

To begin with, it is clear that plaintiff's earlier IQ scores are not rendered invalid for purposes of the current application just because they predate the alleged onset date in this case.[4]  By definition, low intellectual functioning only

---

[4]Plaintiff's counsel at the agency level agreed at her hearing to amend plaintiff's alleged onset date from June 30, 2000, to July 30, 2001 (Tr. 379). However, this agreement to amend appears to have been based on the fact that the current application was protectively filed more than one year after the initial denial of plaintiff's application dated April 4, 2000 (id.), from which counsel appears to have concluded that the prior determination could not be reopened.  See 20 C.F.R. § 416.1488 ("A determination ... may be reopened – (a) Within 12 months of the date of the notice of the initial determination, for any reason;...").  However, there appears to have been an intervening application and agency determination which, in the undersigned's view, the ALJ implicitly reopened.  While both plaintiff and the government state in their briefs that the current application was filed on February 13, 2001 (citing Tr. 55-56), it appears that the application filed on that date was given a protective filing date of December 28, 2000 (Tr. 54, 69), was developed in part by referral to Dr. Hebda for his first consultative examination of plaintiff (Tr. 164-68), and was initially denied by the state agency on April 10, 2001 (Tr. 29-30).  It does not appear that plaintiff pursued this application, choosing instead to file the current application in August 2001, alleging the same onset date of June 30, 2000 (Tr. 60-62).  The current application was given a protective filing date of July 30, 2001 (Tr. 31, 106), as recognized by the ALJ (Tr. 13).  By letter dated June 27, 2003 (Tr. 143-44), counsel explicitly requested reopening "as far back as possible, which should be at least to one prior filing due to this new and material evidence enclosed herewith" (referring to the June 2003 opinion letter of Dr. Berberich and supporting materials, Tr. 256-66).  The ALJ never ruled on this request for reopening, nor the Appeals Council on plaintiff's request for review (Tr. 7).  However, the ALJ presumably considered the submission from Dr. Berberich, as he subsequently requested an assessment and relevant medical records which Dr. Berberich was unable to supply (Tr. 284).  The ALJ subsequently admitted into evidence three prior claim folders (Tr. 375), though only the folder associated with plaintiff's February 2001 application made it into the transcript filed with this Court.  Most importantly, in his written decision, the ALJ expressly addressed plaintiff's mental health in the year 2000 and before, and adopted the March 2001 RFC assessment of the state agency consultant procured in conjunction with the February 2001 application, over the September and October 2003 assessments of Dr. Cha (Tr. 16, 169-76), without invoking res judicata to preclude reconsideration of any prior determinations.  Accordingly, the undersigned concludes that the ALJ implicitly reopened the determination of the claim filed February 13, 2001, in which plaintiff alleged the onset of disability within the same month as she was evaluated by Dr. Zecca, and as a result of which plaintiff's eligibility for any potential SSI benefits would begin on December 28, 2000.  See Martin v. Comm'r of Soc. Sec., 82 Fed. Appx. 453, 455, 92 Soc. Sec. Rep. Serv. 333

contributes to a diagnosis of mental retardation if its onset can be traced to the individual's developmental period. Moreover, "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in ... intellectual functioning." Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001). The ALJ does not cite any evidence which would indicate an upswing in plaintiff's intellectual functioning from 2000 and years prior, other than the higher scores obtained in 2003, nor does he explicitly declare Dr. Zecca's assessment invalid. See id. It is clear that plaintiff's test scores just prior to her alleged onset date remain relevant to the determination of her current condition, unless they are properly found by the ALJ to be invalid. Without the ability to examine Dr. Zecca's report, and in the absence of any specific findings by the ALJ in support of his rejection of those scores, the undersigned questions the sufficiency of the evidence in support of the ALJ's decision, particularly in view of the evidence which "fairly detracts from its weight." Beavers v. Secretary of Health, Educ. & Welfare, 577 F.2d 383, 387 (6th Cir. 1978).

The evidence in the record which the ALJ did not address or even reference in his written decision includes (1) the October 1984 "Psycho-Educational Study" performed by the "school psychologist" at plaintiff's elementary school (Tr. 264-

(6th Cir. Nov. 18, 2003)(citing Crady v. Sec'y of Health & Human Servs., 835 F.2d 617 (6th Cir. 1987)).

17

66), in which past results of intelligence testing in 1979 and 1981, classifying plaintiff in the "EMR" (educable mentally retarded)[5] range, were discussed along with past behavior problems and then-current intelligence and achievement testing, which resulted in scores either within or below the first percentile of plaintiff's peer group, leading to plaintiff's classification at age 12 as moderately to mildly mentally deficient and the recommendation that plaintiff be placed in a more intensive form of special education; (2) the records of plaintiff's schooling (Tr. 67-68), which demonstrate her academic deficiencies despite her placement in "resource" special education classes; (3) the June 2003 comments from Dr. Robert Berberich, Ed.D., interpreting plaintiff's school records (Tr. 256-57)[6]; (4) the evidence from Harriett Cohn Center indicating that plaintiff was unable to reclaim custody of her three older children from the state because of her naivete, lack of insight, and lack of judgment (Tr. 269-76); (5) other evidence from Harriett Cohn indicating plaintiff's adjustment disorder and other deficits (Tr. 197-212), including the assessment of

---

[5]"Educable mentally retarded" is an outdated term for what is now known generally as "'mildly' mentally retarded (IQ level of 50-55 to approximately 70)." Antonetti v. Barnhart, 399 F.Supp.2d 199, 201 n.3 (W.D.N.Y. 2005)(citing Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition-Text Revision), at 42-43).

[6]Plaintiff's counsel before the agency specifically appealed the ALJ's failure to discuss Dr. Berberich's submission, "since he opines the [claimant's] limitations are 'marked,' and began during school, before she was age 21!" (Tr. 9)

Case 3:05-cv-00656   Document 17   Filed 04/24/07   Page 18 of 21 PageID #: 62

"regular or frequent difficulty" in adapting to change, which "will require some intervention" (Tr. 208), and (6) the July 2002 neuropsychological evaluation by Dr. Hebda, which yielded IQ and achievement test scores lower than those assessed at his 2003 consultative exam (though still within the borderline range), and which also revealed "severely impaired" academic skills and "severe [attention deficit disorder] symptoms of visual and auditory distraction and learning disabilities in reading and written language [because of which] she is prone to careless errors, not completing tasks within time limits, and missing essential details because of her distractibility." (Tr. 282-83)

In short, the ALJ's decision with regard to plaintiff's mental impairments relies for support on a single consultative evaluation[7] and--in the near total absence of any explicit, underlying rationale--its own bootstraps. The Sixth Circuit has stated that "an 'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence

_____

[7] Perhaps noteworthy is the following statement from Dr. Hebda's 2003 consultative report, immediately following his report of IQ scores between 76 and 79: "The chances that range of scores from 73 to 80 include true IQ score of 90 out of 100." (Tr. 292) If the import of this statement is that 90% of the time, WAIS-III test results which range from 73 to 80 in each of the Verbal, Performance, and Full Scale domains accurately reflect a valid IQ in that range, it would be interesting to know the percentages that obtain when a person's scores drop below 73, as plaintiff's did when Dr. Hebda reported a Full Scale score of 72 in 2002, and when Dr. Zecca reported scores in the 60s.
Certainly noteworthy is the fact that neither of Dr. Hebda's consultative reports accounted for the "severe ADD symptoms" which he observed upon neuropsychological testing in 2002 (Tr. 283).

to allow the appellate court to trace the path of his reasoning.'" <u>Lowery v. Comm'r of Soc. Sec.,</u> 55 Fed. Appx. 333, 2003 WL 236419, at *5 (6th Cir. Jan. 30, 2003)(<u>quoting</u> <u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995)).  Considering the shortcomings discussed above, the undersigned does not believe that the requirement of minimal articulation has been met in this case.  Accordingly, the undersigned must conclude that even the deferential standards of substantial evidence review cannot be satisfied on this record.  Rather, in view of record evidence which could easily suffice to establish the diagnostic description of mental retardation under the listings, and the suggestion of evidence (i.e., Dr. Zecca's report) which might further plaintiff's case for presumptive disability, the undersigned must recommend remand for further administrative development of the issue.  Even if plaintiff's current intellectual functioning is deemed to be sufficiently demonstrated by the medical evidence to be above listing level, further administrative attention must be given to the combined functional effects of plaintiff's cognitive deficits and her attention deficit-hyperactivity disorder.

### IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the

20

administrative record be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 24th day of April, 2007.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

21